Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 8, 2004        Decided May 14, 2004

No. 03-1162

CONSUMERS ENERGY COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ONTARIO ENERGY TRADING INTERNATIONAL CORPORATION AND
INDEPENDENT ELECTRICITY MARKET OPERATOR,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Raymond E. McQuillan* argued the cause for petitioner. On the briefs was *Deborah A. Moss.* *Jon R. Robinson* entered an appearance.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Matthew W.S. Estes* was on the brief for intervenors. *Howard E. Shapiro* and *John J. Buchovecky* entered appearances.

Before: GINSBURG, *Chief Judge*, and RANDOLPH and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: It was a close thing, but Benedict Arnold's bold plan to capture Canada for the Revolution fell short at the Battle of Quebec in early 1776. As a result, the Federal Energy Regulatory Commission must now decide when affiliates of Canadian utilities — utilities not subject to FERC jurisdiction — may sell power at market-based rates in the United States. In a purely domestic case, FERC requires an applicant for market-based rates to show that it and its affiliates do not have or have adequately mitigated market power in generation and transmission, and cannot erect other barriers to entry. An applicant with a transmission-owning affiliate must show that the affiliate has filed an open access, non-discriminatory tariff for transmission service. *See Progress Power Marketing, Inc.*, 76 FERC ¶ 61,-155, at 61,919 (1996).

FERC does not presume to tell foreign transmission-owning utilities what tariffs they must file. If a marketing affiliate of such a utility wants to sell power at market-based rates in the United States, however, the utility must offer transmission service *comparable* to that required of a utility in the United States. Just as a domestic transmission-owning utility must allow competitors of its marketing affiliate to use its transmission services on a non-discriminatory basis to compete with the marketing affiliate, so too a foreign transmission-owning utility must allow companies that would compete with its marketing affiliate to use its transmission services to reach the United States market and compete on a

level playing field with its marketing affiliate. *See Energy Alliance P'ship*, 73 FERC ¶ 61,019, at 61,030–31 (1995).

In this case, Ontario Energy Trading International Corporation (Ontario Energy) sought authority to sell power in the United States at market-based rates pursuant to Section 205 of the Federal Power Act, 16 U.S.C. § 824d. Ontario Energy's application was opposed by Consumers Energy Company (Consumers), a public utility providing service in Michigan and potentially facing competition from Ontario Energy across the border. Consumers argued that the Ontario Independent Electricity Market Operator (IMO) was an affiliate of Ontario Energy and did not offer open access, non-discriminatory transmission service comparable to that required of power companies in the United States. Specifically, Consumers complained that the IMO did not offer transmission service from point A to point B at all, as a United States utility would, but instead required companies seeking such service to sell power into the system at point A and buy it back out at point B. FERC nonetheless found the IMO service comparable to that required of companies in the United States, and granted Ontario Energy the requested authority to sell power at market-based rates. *See Ontario Energy Trading Int'l Corp.*, 99 FERC ¶ 61,039 (*Initial Order*), *on reh'g*, 100 FERC ¶ 61,345 (2002) (*September 2002 Order*), *on reh'g*, 103 FERC ¶ 61,044 (2003) (*April 2003 Order*). Finding that substantial evidence supports the Commission's decision and that the decision is otherwise reasonable, we deny Consumers' petition for review.

## I. Background

In its landmark Order No. 888, FERC required public utilities subject to its jurisdiction that own, control, or operate transmission facilities to guarantee non-discriminatory transmission service to all market participants. *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, FERC Stats. & Regs. ¶ 31,036, at 31,635–36

(1996) (Order No. 888). To ensure non-discriminatory service, the Commission required public utilities (1) to functionally unbundle wholesale power services — separating generation, transmission, and ancillary services, *id.* at 31,654, and (2) to file open access, non-discriminatory transmission tariffs, *id.* at 31,635. *See generally New York v. FERC*, 535 U.S. 1, 11 (2002).

Foreign market participants may also obtain transmission service through a public utility's open access tariff. *Id.* at 31,689. Participants with foreign affiliates that own or control transmission facilities, however, may obtain open access transmission only if those affiliates comply with tariff reciprocity requirements. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at 30,290 (1997) (Order No. 888-A). Those reciprocity requirements mandate that the foreign transmission-owning affiliate also provide open access, non-discriminatory transmission service in the same manner as a public utility in the United States. *Id.*

## A.   Restructuring the Ontario Energy Market

In 1997, Ontario Hydro, a government-owned utility servicing the Province of Ontario, sought a stay of Order No. 888's reciprocity requirement. *See Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 79 FERC ¶ 61,182 (1997). The utility claimed that it would be irreparably harmed by the requirement because it could not allow open access into Ontario without the approval of the Provincial Government of Ontario. *Id.* at 61,866. The Commission rejected the stay, *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 79 FERC ¶ 61,367 (1997), and the Province of Ontario elected to restructure its electric-

ity market in order to secure access to that of the United States.

At that time, the provincial energy market was dominated by Ontario Hydro, a vertically integrated utility. Ontario Hydro generated most of the Province's power, owned and operated the bulk electricity transmission system, owned and operated much of the distribution system, sold power at wholesale rates to municipal utilities in urban areas, regulated those municipalities' retail rates, and sold electricity directly to retail customers in rural and suburban areas. *See Initial Order*, 99 FERC at 61,145.

To establish a competitive market, the Ontario Energy Competition Act of 1998 unbundled the functions of power generation, power transmission, and control of the bulk power system. The Act separated those functions and transferred them to three new entities: (1) Ontario Power Generation, Inc. (OPG) owns and operates power generation facilities; (2) Hydro One, Inc. owns and operates the transmission system and portions of the distribution system; and (3) the IMO operates the bulk power system and the wholesale electricity market. Application of Ontario Energy Trading Int'l For Order Approving Market-Based Tariff, at 3–4 (Ontario Energy Application). The Provincial Government holds all the shares of both OPG and Hydro One, appointing the directors of both. *September 2002 Order*, 100 FERC at 62,580. Ontario Energy — an electric power marketing company that buys and sells electricity, but itself owns no power generation or transmission assets — is a wholly-owned subsidiary of OPG. The Provincial Government also appoints the directors of the IMO, a not-for-profit transmission and market operator. Those directors may be removed only for cause. *Id.* at 62,581.

The IMO assumed operational control of Hydro One's transmission assets, and became responsible for establishing and operating a provincial electricity market. *See* Ontario Energy Application at 7–9. The Act required the IMO to develop rules to open the market to competition on an open access, non-discriminatory basis. *Id.* at 9. The IMO com-

plied, promulgating rules that created a bid-based electricity market in which the cost of electricity is set by market participants bidding to buy or offering to sell electricity. *Id.* Much like a stock exchange, the IMO administers the market, and is neither a buyer nor seller of electricity except when required under emergency conditions to maintain system reliability. *See* IMO Market Rules, Chapter 1, § 5.3.

The bid-based market administered by the IMO packages power and transmission together as a single product. *See* Brief of Ontario Energy Trading Int'l Corp., Docket No. ER02-1021-000 (July 31, 2002), at 10–12 (Ontario Energy FERC Br.). In the United States, most regional transmission organizations (RTOs) and independent system operators (ISOs) treat power and transmission as two different products. Indeed, Order No. 888 requires RTOs and ISOs to allow market participants to reserve transmission capacity on their systems in advance of power purchases. *See* Order No. 888 at 31,938–39. In the United States, a power marketer can purchase the right to transmit power from point A to point B at a set time for a set price, apart from the purchase of power itself. Not so in Ontario. Entities wishing to transmit electricity through and out of Ontario, from point A to point B, must sell power into the IMO market at point A to enter the transmission system, and then buy power from the market at point B to exit the system. Because this distinction is central to the comparability dispute before us, a more detailed examination of the IMO market is in order.

### B. The IMO Energy Market

The IMO operates a real-time electricity market, establishing a uniform market-clearing price for all electricity bought or sold within Ontario. That uniform price is calculated based upon three factors: (1) the market price — matching bids and offers; (2) the uniform uplift charge; and (3) transmission service charges. *See* Ontario Energy FERC Br. at 10–12. The uniform uplift charge allocates the costs of internal congestion management across the market. *See id.*

at 11–12.[1]  Transmission service charges recoup the costs of operating the transmission system, and are regulated.  Under this system, purchases and sales can be made at any location on the IMO system at the uniform market-clearing price without regard to internal transmission limitations.

The IMO market uses the same system to facilitate imports into and exports out of Ontario.  The Ontario transmission system is connected to adjacent regions' transmission systems through external interfaces called interties.  Market participants import power into the Ontario transmission system by selling electricity into the IMO market at one of the interties, while those wishing to export power out of the Province do so by purchasing electricity at an intertie adjacent to the desired destination.  *Id.* at 12.  Congestion may occur at an intertie when the imports offered or exports sought exceed the transfer capability at that intertie.  Unlike the situation with respect to the internal congestion control system, the IMO controls congestion at the interties through a market-based approach.[2]  At each intertie, the IMO establishes an intertie zone price (IZP) set at the level at which supply meets

[1]  Even though transmission service is packaged with the purchase of electricity, the market price takes into account only the demand for electricity, not the demand for transmission.  The market price, in effect, assumes that the transaction costs of transmission demand are zero so that purchased electricity can be transmitted immediately to meet real-time demand — a process termed the "unconstrained dispatch solution."  The IMO market actually uses a "constrained dispatch solution," which allows some units to transmit immediately while delaying others until transmission capacity is available.  That process generates costs to reimburse the delayed units for any difference in price between the transaction price and the actual price at the later time of transmission.  Those reimbursements are the cost of internal congestion management, recouped through the uniform uplift charge.

[2]  The internal congestion approach of scheduling power dispatches from generation facilities, *see* note 1 *supra*, is not viable because the IMO cannot require generation facilities outside Ontario to comply with dispatch schedules.  Ontario Energy FERC Br. at 12.

demand within the transfer capacity of that intertie. *See id.* at 12–13. Put another way, the IZP clears congestion by prioritizing competing transfers according to price so that the most desired transfer clears first. *See id.* at 13.

Say a market participant wishes to export power from New York into Ontario. That participant must offer to sell the power into the IMO market. If the market-clearing price in the IMO is $20, and the quantity of power offered at or below $20 is equal to or less than the transfer capacity at the New York-Ontario intertie, then there is no congestion and all parties offering to sell power into Ontario for $20 or less will receive the $20 market-clearing price. *See id.* In the same scenario, if the quantity of imports offered exceeds the transfer capacity at the intertie, then the IZP would fall below the market-clearing price to reduce supply into the market — the IZP falling until enough market participants cease making offers to sell power into Ontario from New York.

Exporting power out of Ontario is accomplished in a similar fashion by purchasing power at the market-clearing price at an intertie adjacent to the desired destination. If the market-clearing price is $20 and the demand for exports out of Ontario at or above that price is equal to or less than the transfer capacity of that intertie, then the transfer capacity can accommodate the demand. *See id.* at 15. If the demand exceeds the transfer capacity, the IZP rises above $20 to reduce the demand, increasing until enough purchasers cease bidding so that the transfer capacity can handle the remaining bids.

A party wishing to wheel power through the Province must engage in a combined import/export transaction. As explained, the IMO system packages transmission service with the purchase of energy, so transmission service alone can be neither reserved nor obtained in a separate transaction, as it can in the United States. Market participants wishing to transmit power, for example, from New York to Michigan through Ontario must simultaneously sell power into the IMO market at the New York-Ontario intertie and purchase power out of the market at the Ontario-Michigan intertie. *See id.* at

16. Using the example above, if there is no congestion at either intertie, then the wheeler would sell into the system at the $20 market-clearing price and buy out of the system at the $20 market-clearing price, resulting in an off-setting transaction; the only cost would be an export fee. *See id.* If there is congestion at either intertie, the cost would be the export fee plus any difference between the IZP and the market-clearing price at either intertie. *Id.*

Market participants can hedge the risk of congestion costs at interties during wheeling transactions by purchasing something called financial transmission rights (FTRs). *Id.* at 17; *see also April 2003 Order*, 103 FERC at 61,174. FTRs are purely financial instruments that entitle the holder to payments equal to the difference between the Ontario market-clearing price and an IZP. The IMO maintains a market in FTRs, periodically auctioning FTRs that span durations of either one month or one year. Ontario Energy FERC Br. at 17. Each FTR corresponds to a particular intertie; separate FTRs must be purchased for imports and exports at each intertie. *Id.* FTRs effectively guarantee the import or export of power at the uniform system-wide market-clearing price, regardless of any IZP.

## C. Procedural History

On February 14, 2002, Ontario Energy filed its application with the Commission under Section 205 of the Federal Power Act, 16 U.S.C. § 824d, seeking authority to sell energy, capacity, and ancillary services, and to resell transmission capacity, at market-based rates. *Initial Order*, 99 FERC at 61,145. Consumers filed a conditional protest to Ontario Energy's application, reserving the right to challenge the application if the IMO failed to grant a transmission reservation allowing Consumers to wheel power through Ontario. Motion to Intervene and Conditional Protest of Consumers Energy Co. at 2–3. Consumers then went to the IMO and asked for approval of a "firm 50 MW transmission reservation for May 2002" to facilitate its procurement of electricity from New York suppliers and transmission of that power through Ontario to Michigan. Letter from Consumers to IMO (Mar.

6, 2002). The IMO denied the request, explaining that the IMO system does not provide transmission reservations, but that instead Consumers could perform an import/export transaction to wheel power through the Province. Consumers thereupon filed a supplemental protest to Ontario Energy's application, claiming that "Ontario Energy possess[es] transmission market power by virtue of its affiliation with . . . the IMO, which is not mitigated by the provision of open-access transmission service." Supplemental Protest of Consumers Energy Co. at 7.

In the *Initial Order*, the Commission concluded that Ontario Energy's application presented "no transmission market power concerns," finding that Ontario Energy does not own or operate transmission facilities and is not an affiliate of any transmission-owning public utilities. 99 FERC at 61,146–47. The Commission accordingly granted the application. *Id.* at 61,147. Consumers sought rehearing, arguing that the IMO and Ontario Energy were affiliated entities and that the IMO did not offer open access transmission service on a non-discriminatory basis comparable to the standards established in Order No. 888. *September 2002 Order*, 100 FERC at 62,581 ¶ 12. This time the Commission agreed with Consumers that Ontario Energy and the IMO were affiliated, but denied the request for rehearing, finding that the "IMO provides open access transmission service on a comparable, non-discriminatory basis" in accordance with the principles of Order No. 888. *Id.* ¶ 13.

Consumers again requested rehearing. *See April 2003 Order*, 103 FERC at 61,172. Having prevailed on the affiliation issue, it argued that the IMO's service was not comparable to transmission service in the United States because the IMO does not allow the reservation of transmission capacity. According to Consumers, this inability to reserve transmission capacity prevents market participants from obtaining a fixed price for transmission service, creating price uncertainty for transactions through Ontario. *Id.* at 61,173. Pointing to the fact that Ontario Energy could obtain firm transmission service reservations at a fixed price from utilities in the United States, Consumers argued that the IMO's bid-based

market failed to satisfy the basic reciprocity requirements of Order No. 888. *See id.*

The Commission again denied Consumers' request for rehearing. The Commission noted that "Consumers concedes . . . there is no evidence in this case suggesting that the IMO operates its transmission system on a discriminatory basis," and that the IMO's governing statute prohibits such discrimination. *Id.* at 61,174 ¶ 9. Rejecting Consumers' claims concerning lack of comparability, the Commission found that allegations of potential price increases caused by the IMO's bid-based system failed to support "a finding that the design of the IMO's transmission system, *per se*, unduly impedes Consumers, or any of Ontario Energy's other competitors, from reaching United States loads." *Id.* ¶ 10. To the contrary, evidence showed that at least 12 United States-based power marketers had traded successfully in and out of the IMO market. *Id.* The Commission concluded that even though the IMO market does not offer the type of point-to-point transmission service required under Order No. 888, market participants can "obtain firm point-to-point service through and out of Ontario at a price that is known in advance (albeit through a process that involves both the advance purchase of transmission rights and bidding to buy and sell energy in the Ontario energy market)" — "provid[ing] open access transmission on a comparable, nondiscriminatory basis for wheeling through and out of . . . Ontario." *Id.* ¶ 13.

Consumers petitioned this court to review the April 2002, September 2002, and April 2003 orders.

## II. Analysis

1. This court reviews the award of market-based rate authority to determine whether the Commission's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 366 (D.C. Cir. 1998). The Commission's factual findings are conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b).

The Federal Power Act requires that public utilities charge "just and reasonable" rates for the transmission or sale of electric energy. *Id.* § 824d(a). In competitive markets, "FERC may rely upon market-based prices in lieu of cost-of-service regulation to assure a 'just and reasonable' result." *Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993). "[T]he Commission approves applications to sell electric energy at market-based rates only if the seller and its affiliates do not have, or adequately have mitigated, market power in the generation and transmission of such energy, and cannot erect other barriers to entry by potential competitors." *Louisiana Energy*, 141 F.3d at 365 (footnote omitted); *accord* Order No. 888 at 31,656.

"To demonstrate the requisite absence or mitigation of transmission market power, the Commission normally requires a power marketer to show that a transmission-owning utility affiliate has on file with the Commission an open access transmission tariff for the provision of comparable services." *TransAlta Enters. Corp.*, 75 FERC ¶ 61,268, at 61,875 (1996); *accord* Order No. 888 at 31,656–57. Order No. 888 mandated that public utilities file open access transmission tariffs that "offer[ ] both network, load-based service and point-to-point, contract-based service," and established a pro forma tariff to define the "non-price minimum terms and conditions of non-discriminatory transmission" necessary for compliance. Order No. 888 at 31,636. Under the pro forma tariff, utilities must offer firm point-to-point transmission service — transmission service "that is reserved and/or scheduled between specified [p]oints of [r]eceipt and [d]elivery." *Id.* at 31,931. Such transmission service allows market participants to reserve transmission capacity to wheel power across different transmission systems, "provid[ing] a means for wholesale power sellers and buyers to obtain transmission services necessary to compete in, or to reach, competitive markets." *Id.* at 31,673.

As noted, the Commission does not require foreign utilities to implement Order No. 888 pro forma tariffs. *TransAlta*, 75 FERC at 61,875 ("[W]e have no direct authority to require [u]tilities, over which we do not have jurisdiction, to file an

open access tariff."). The Commission is instead "amenable to a variety of approaches" to show the absence or mitigation of transmission market power by foreign utility affiliates of power marketers, so long as the power marketer demonstrates that "its transmission-owning utility affiliate offers non-discriminatory access to its transmission system that can be used by competitors of the power marketer to reach United States markets." *Id.* (citing *Energy Alliance*, 73 FERC at 61,030–31). The Commission considers this question on a case-by-case basis. *H.Q. Energy Servs. (U.S.) Inc.*, 79 FERC ¶ 61,152, at 61,652 (1997).

2. The obvious difference between United States and Ontario power markets — here, transmission and power can be marketed separately; there, they must be bought and sold as a package — provided Consumers with a ready basis for arguing that the IMO "does not presently offer transmission service that is reciprocal or comparable or non-discriminatory relative to that provided in the United States." Pet. Br. at 18. According to Consumers, the IMO system does not allow the reservation of firm point-to-point transmission at a definite price, as required under Order No. 888. The system instead subjects market participants who wheel power through Ontario to uncertainty in pricing based upon potential congestion at interties. That uncertainty allegedly harms Consumers in transactions involving wheeling energy from New York to Michigan through Ontario's transmission system — when selling wholesale power in Michigan, any price advantage gained by Consumers from purchasing wholesale power in New York could be lost in transmission through Ontario due to congestion costs at the interties. *See id.* at 23.

The Commission found, however, that because the IMO allows market participants to hedge the risk of congestion costs at interties through the purchase of FTRs, which "provide their holders with payments equal to the difference between the applicable intertie zone price and the system-wide price," market participants seeking to wheel power across Ontario *are* able to obtain a fixed price for a through and out transaction such as the one at issue in Consumers' petition — selling power into Ontario at the New York-

Ontario intertie and purchasing it back at the Ontario-Michigan intertie. *See April 2003 Order*, 103 FERC at 61,174 ¶¶ 12, 13. Utilizing FTRs, market participants may "obtain firm point-to-point service through and out of Ontario at a price that is known in advance." *Id.* ¶ 13. Although the IMO does not provide point-to-point transmission service in the manner prescribed by Order No. 888, the Commission reasonably concluded that the IMO provides comparable transmission service. And that service is non-discriminatory: any entity desiring to transmit power from point A to point B on the IMO system must engage in the same sell-in/buy-out sort of transaction. Affidavit of Cliff W. Hamal at ¶ 18.

Consumers argues that the Commission disregarded substantial factual evidence showing that the IMO system fails to mitigate the generation market power of OPG, the parent of Ontario Energy. "OPG's generation market dominance in the IMO service area creates the potential for OPG to extract significant revenues by causing constraints and congestion-related price differentials at various export [interties]." Pet. Br. at 23–24. Consumers argues that OPG could, for example, flood the Ontario-Michigan intertie with export electricity, purposefully driving up the price to wheel power through Ontario to Michigan. By thereby increasing the cost of transmission, OPG could undercut Consumers' ability to reap the advantage of transporting cheaper New York power to Michigan through Ontario. OPG thus could establish a barrier to market participants wishing to enter the Michigan market — or any other market with an adjacent intertie to Ontario.

The Commission concluded that Consumers' claims of potential price manipulation are "speculative, at best," *April 2003 Order*, 103 FERC at 61,174 n.10, and we agree. In its second application for rehearing, Consumers merely advanced bare allegations of potential price increases at the interties: "Consumers allege[d] that the bid-based market operated by the IMO may require Consumers to incur higher (unspecified) costs to reach the Michigan market, in certain (unspecified) instances when ... the IMO ... [must] address a market constraint on its system," *id.* ¶ 9. Consumers provid-

ed no evidence tying OPG's market share to increased transmission prices or any episodes of discriminatory conduct. *Id.* at n.10.

On the other hand, substantial record evidence undermines Consumers' abstract contentions. First, the Commission found that since May 1, 2002 — the commencement of the IMO-administered market in Ontario — 12 United States-based power marketers had traded successfully through and out of the Ontario transmission system at the Ontario-Michigan intertie. *Id.* ¶ 10. Next, even assuming that OPG could manipulate prices by causing congestion at a particular intertie and raising the IZP, a market participant could negate any price impact by purchasing FTRs. Finally, the Commission found that OPG has no generating market power outside Ontario. *See Initial Order*, 99 FERC at 61,146. OPG thus would be cutting off its nose to spite its face by congesting an intertie out of Ontario: that would increase the price to export electricity, making it more difficult *for OPG* to compete in the United States, where it would be selling more expensive electricity without the benefit of market power. We accordingly conclude that the Commission was reasonable in finding "no evidence . . . that Consumers has [been] or will be impeded from reaching Michigan markets," *April 2003 Order*, 103 FERC at 61,174 ¶ 10.

Finally, Consumers broadly argues that simply because the IMO service is different from that required under Order No. 888, it should not have been accepted by FERC: "Either the Commission believes its standards of market power mitigation and open access transmission service are the right standards, or it doesn't[;] it should not matter in that context that the affected entities at issue are Canadian." Pet. Reply Br. at 10. We think it reasonable for the Commission to acknowledge the reality of an international border in deciding whether to insist on compliance with the minutiae of its regulatory requirements; it was certainly open to FERC to decide that a flexible approach requiring comparability on a case-by-case basis rather than letter-for-letter compliance across-the-board better accommodates jurisdictional limits and promotion of competitive markets for United States loads. *See Energy Alliance*, 73 FERC at 61,030 (FERC interest in imposing

comparability requirements on foreign affiliates is to promote competition to serve United States loads).

3.  Consumers also argues that the IMO does not provide comparable service because it fails the particular independence requirements set forth in the Commission's Order No. 2000, 65 Fed. Reg. 809 (Jan. 6, 2000). Our jurisdiction is limited to objections that have been raised before the Commission in an application for rehearing. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing"). Consumers asserted an independence argument based on Order No. 2000 to challenge the Commission's initial findings on affiliation, not comparability. *See* Brief of Consumers Energy Co., Docket No. ER02-1021-001 (July 30, 2002), at 5. Consumers *won* on affiliation; FERC would not even have proceeded to address comparability in the absence of such a ruling. Consumers did not separately argue below that the IMO's lack of independence affected its ability to afford comparable transmission service, and such an argument is distinct from a contention that entities are affiliated so that the Commission must *consider* comparability. The Commission, therefore, never had the opportunity to address the particular argument that Consumers now attempts to raise, and we accordingly lack jurisdiction to consider it. *See City of Orrville v. FERC*, 147 F.3d 979, 990 (D.C. Cir. 1998).

\*　　　\*　　　\*

The petition for review is denied.