**FEDERAL ELECTION COMMISSION**

v.

**NATIONAL REPUBLICAN SENATORI-AL COMMITTEE, et al., Appellants.**

**No. 91–5176.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1992.

Decided June 12, 1992.

Jan Witold Baran, with whom Thomas W. Kirby and Carol A. Laham, Washington, D.C., were on the brief, for appellants.

Marcus C. Migliore, Federal Election Commission, with whom Lawrence M. Noble, General Counsel, and Richard B. Bader, Associate General Counsel, Washington, D.C., were on the brief, for appellee.

Roger M. Witten, W. Hardy Callcott and Carol F. Lee, Washington, D.C., were on the brief for Common Cause, as amicus curiae, urging affirmance.

Before: RUTH BADER GINSBURG, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Federal Election Campaign Act, 2 U.S.C. §§ 431–455, imposes numerous limitations on campaign contributions. Two are relevant here. For each election, no individual may give more than $1,000 to any Senate candidate. 2 U.S.C. § 441a(a)(1)(A). No national senatorial committee may give more than $17,500 to any Senate candidate. 2 U.S.C. § 441a(h). The Federal Election Commission has issued regulations interpreting and implementing these statutory commands. One such regulation, 11 C.F.R. § 110.6(d), deals with transactions of the sort before us in this case: an individual gives a contribution to a national political committee for the committee to pass on to the candidate.[1] The regulation provides that a donor may "earmark" a contribution given to a national political committee, indicating that it is for the benefit of a certain, specified candidate. 11 C.F.R. § 110.6(a). A committee receiving such an "earmarked" contribution in the form of a check made out to a candidate simply passes the check along. 11 C.F.R. § 110.6(c)(4)(iii). When the check is payable to the committee, the check may be deposited in the committee's account, and equivalent funds forwarded to the specified candidate. 11 C.F.R. § 110.-6(c)(1)(i), (c)(4)(iii). In either case, the funds

---

1. During the period relevant to this case, the pertinent parts of the provision read:

    (a) All contributions by a person made on behalf of or to a candidate, including contributions which are in any way earmarked or otherwise directed to the candidate through an intermediary or conduit, are contributions from the person to the candidate.

    (b) For purposes of this section, earmarked means a designation, instruction, or encumbrance (including those which are direct or indirect, express or implied, oral or written) which results in all or any part of a contribution or expenditure being made to, or expended on behalf of, a clearly identified candidate or a candidate's authorized committee.

    ....

    (d)(1) A conduit or intermediary's contribution limits are not affected by passing on earmarked contributions, except where the conduit exercises any direction or control over the choice of the recipient candidate.

    (2) If a conduit exercises any direction or control over the choice of the recipient candidate, the contribution shall be considered a contribution by both the original contributor and the conduit....

11 C.F.R. § 110.6 (1986). The regulation has since been modified in ways that do not affect this litigation.

must be forwarded within ten days. 11 C.F.R. § 102.8(a), (c).

Earmarked contributions generally count against the individual donor's personal limit of $1,000 per candidate, 2 U.S.C. § 441a(a)(8); 11 C.F.R. § 110.6(a), not against the committee's $17,500 per candidate limit. 11 C.F.R. § 100.6(d)(1). We say "generally" because the regulation contains an "unless": if the committee exercises "direction or control over the choice of the recipient candidate," the contribution is "double counted": it counts against *both* the individual's per candidate limit *and* the committee's per candidate limit. 11 C.F.R. § 110.6(d)(2). This case concerns the construction of the regulation's terms "direction" and "control," and presents the question whether contributions solicited, received, and passed along by the National Republican Senatorial Committee (NRSC) in a fundraising campaign fit within the appropriate construction.

## I

The NRSC is a national political committee organized to support Republican candidates for election to the United States Senate. In September 1986 it sent out approximately 600,000 letters, seeking to raise funds for candidates in twelve races the Committee believed were close. The general thrust of the letters[2] was that if the Republicans lost control of the Senate in the upcoming election, then-President Reagan would have a much more difficult time implementing his administration's programs. Each letter listed four states with close Senate races, and informed the recipient that if the Republican candidate in those races did not receive a certain amount of money in a certain amount of time, the vital races would be lost. The names of the candidates did not appear in the letters; each referred only to the Republican candidates in the four states. Various combinations of four states appeared in the letters; in all, twelve states were covered. The campaign committee of the individual Republican candidate in each state had entered into an agreement with the NRSC authorizing the solicitation. The letters concluded by suggesting a contribution amount, which again varied from letter to letter, and by stating that any contribution made would be divided equally among the candidates in the four states listed.

Each mailing enclosed a donation card on which a donor could mark one of three spaces, indicating that he was giving (a) the suggested amount, (b) a pre-specified higher amount, or (c) an amount he himself specified and wrote in. The donation card reiterated that any money would be divided equally among candidates in the four listed states.[3] Checks were to be made out either to the NRSC directly, or to one of various funds controlled by the NRSC.

Approximately 92 percent of the people solicited did not send money. 761 F.Supp. at 814. Those who did—43,371 persons—contributed a total of approximately $2.3 million, on average $54 per contributor. *Id.* The NRSC deposited all checks in its accounts, divided the amount of each check equally in conformity with the accompanying donation card, and passed the money on to the respective campaigns.

Common Cause filed a complaint with the Commission in October 1986, alleging that the NRSC had violated 2 U.S.C. § 441a(h) by exceeding its contribution limits, in light of the fact that under 11 C.F.R. § 110.6(d)(2) it had exercised "direction or control" over the contributions. The Commis-

---

**2.** A sample letter is set out as Appendix I of the district court's second opinion in this case, *Federal Election Comm'n v. National Republican Senatorial Comm.,* 761 F.Supp. 813, 826–27 (D.D.C.1991).

**3.** The donation card read:

I understand that our Senate campaigns in [State], [State], [State], and [State] need *immediate* financial assistance to win this November. To make sure our candidates have the funds they need, I'm enclosing the most generous contribution I can to be split equally among them. Enclosed please find my special candidate check for:

( ) $XX [specified] ( ) $YY [specified]
( ) $—— Other

Please make your check payable to [name of fund].

The donation card is reprinted as part of Appendix I to the district court's second opinion, 761 F.Supp. at 828.

sion's General Counsel notified the NRSC's attorney that a complaint had been filed. The NRSC responded, opposing the complaint's allegations. In April 1987, the Commission determined that there was "reason to believe" that the NRSC had violated not only those provisions, but also 2 U.S.C. § 434(b), by improperly reporting the "directed and controlled" contributions, and § 441d(a), by failing to note on the letters that they were authorized by the candidates. The Commission also believed that NRSC had allocated improperly certain costs of the solicitation. That determination led to a Commission investigation. Approximately two years after the filing of the complaint, during which time the General Counsel and the NRSC exchanged letters and additional briefs, the Commission determined that there was "probable cause" to believe three violations had occurred.

Regarding a fourth charge, alleging "direction or control" under § 110.6(d), the Commission deadlocked 3–3. The Commission has six voting members; no more than three may be of the same political party. 2 U.S.C. § 437c(a)(1). Four votes are needed for the Commission to find probable cause. A tie results in no such finding being entered, and no action being taken against the target of the complaint. 2 U.S.C. §§ 437c(c), 437g(a)(4). In this case, the three Commissioners who voted against probable cause issued a statement of reasons supporting their decision.

In December 1988, the three charges the Commission had voted to pursue were settled in a conciliation agreement, with the NRSC agreeing to pay a $20,000 civil penalty.[4] As far as the Federal Election Commission was concerned, that concluded the matter. The proceedings then became part of the public record (11 C.F.R. § 5.4(a)(4)) and the Commission notified Common Cause of the outcome.

Invoking 2 U.S.C. § 437g(a)(8), a provision entitling a complainant to judicial re-

view of a Commission decision not to pursue a complaint, Common Cause filed suit in federal district court to compel the Commission to act on the fourth charge. The district court held that the "plain language" of 11 C.F.R. § 110.6(d)(2) covered NRSC's activities and that the Commission's order dismissing the complaint, insofar as it alleged that the NRSC violated its contribution limits and reporting requirements, was arbitrary and capricious. *Common Cause v. Federal Election Comm'n*, 729 F.Supp. 148, 152–53 (D.D.C.1990). The court therefore ordered the Commission, on remand, to proceed on the basis that the NRSC exercised "direction or control" over the contributions. *Id.* at 153. When the parties thereafter failed to reach a conciliation agreement, the Commission filed an enforcement action. The district court granted summary judgment for the Commission and imposed a $24,000 penalty on the NRSC. *Federal Election Comm'n v. National Republican Senatorial Comm.*, 761 F.Supp. 813 (D.D.C.1991).

II

■ We pause briefly to address NRSC's argument, rejected by the district court, that because some language in its conciliation agreement with the Commission discussed settlement of the "matter," and because the Commission in some contexts refers to the entire series of transactions or occurrences raised by a filed complaint as a "matter," the agreement bars the agency from maintaining this action. It is true that the Commission may not commence an action regarding a violation comprehended by a conciliation agreement—except, of course, an action to compel compliance with the agreement's terms. 2 U.S.C. § 437g(a)(4)(A)(i). It is also true that complaint proceedings before the agency are styled "Matter Under Review." But the specifics of the agreement and the pre-agreement correspondence between NRSC

---

**4.** Some donors had sent money expressly designated for NRSC's use, not for the candidates', a fact NRSC had failed to notice and report. This issue, *see* 2 U.S.C. § 434(b), was covered by the conciliation agreement. The proper allocation

of solicitation costs as between NRSC and the individual campaigns, *see* 2 U.S.C. §§ 434(b), 441a(h), and NRSC's disclosure of the campaigns' authorization of the mailing, *see* 2 U.S.C. § 441d, were also subjects of the agreement.

and the agency here lead us to reject the NRSC's claim that the agreement comprehended the charge before us.

The conciliation agreement signed by counsel for NRSC[5] stated that the Commission had found probable cause to believe that NRSC had "violated 2 U.S.C. §§ 434(b), 441a(h), and 441d(a)." Conciliation Agreement at 1 (Dec. 23, 1988). It made no mention of 11 C.F.R. § 110.6(d)(2), or of direction or control. After setting forth the parties and the facts, the agreement, in paragraphs V–VIII, specifically describes the alleged violations.[6] Nothing in that description even hints at the violation involved in this case. We cannot see how NRSC, represented as it was by able and experienced counsel, could have construed that agreement to include the charge stemming from § 110.6(d)(2).

Prior correspondence between NRSC and the Commission reinforces our conclusion. The Commission's letter informing NRSC that the Commission had found "reason to believe" that certain violations had occurred specifically listed 11 C.F.R. § 110.6(d)(2), and alleged that "NRSC may have exercised direction and control over the choice of the recipient candidates." Letter from Commission General Counsel to NRSC Counsel at 1 (Apr. 13, 1987). Follow-up letters from the Commission throughout the investigation also refer to § 110.6(d)(2). Letter from Commission General Counsel to NRSC Counsel at 1 (Jan. 28, 1988); Letter from Commission General Counsel to NRSC Counsel at 1 (June 24, 1988). But the letter informing the NRSC of the Commission's "probable cause" vote refers only to the same three statutory sections set out in the conciliation agreement; it does not mention 11 C.F.R. § 110.6(d)(2). Letter from Commission General Counsel to NRSC Counsel at 1 (Aug. 4, 1988). The implication is unmistakable. The investigation had focussed on several violations, all of which were mentioned in investigatory correspondence. The Commission had determined that probable cause existed for some—those listed in the final letter—but not others, which accordingly were not listed. This history, together with the detailed language of the conciliation agreement, convinces us that the district court correctly determined that this suit was not barred by 2 U.S.C. § 437g(a)(4)(A)(i). 761 F.Supp. at 829.

### III

■ The central issue in the case concerns the appropriate construction of the phrase "direction or control" as it appears in § 110.6(d). The NRSC urges one construction, the Commission's counsel another. Ordinarily, we "look to the administrative construction of the regulation if the meaning of the words used is in doubt." *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). That construction is given "control-

---

5. NRSC changed counsel between the time of the conciliation agreement and the time these proceedings commenced.

6. V. The NRSC reported contributions in the amount of $108,068, earmarked for itself, as contributions earmarked for candidates in violation of 2 U.S.C. § 434(b).

VI. The NRSC did not allocate to the twelve candidate committees benefited, and report as contributions, any of the $608,568 in costs related to the unsuccessful Direct–To Auto solicitations in violation of 2 U.S.C. § 434(b). The NRSC contends that it did not allocate and report any of these costs based upon its understanding of the agreements that it had entered into with the candidate committees and of the nature of its activities, and its belief that the NRSC derived substantial benefit for itself from these activities.

VII. Based on the foregoing fact pattern, the NRSC exceeded its $17,500 contribution limitation in 1986 with regard to each of the 12 campaigns benefited by the Direct–To Auto Program by a total of as much as $545,249.25 in violation of 2 U.S.C. § 441a(h).

VIII. The NRSC failed to include on the Direct–To Auto solicitation materials the statement that those communications had been authorized and paid for by the campaigns for which contributions were being sought in violation of 2 U.S.C. § 441d. The NRSC contends that its language was based upon its interpretation of the agreements it had with the various candidate committees, but agrees that, if it undertakes this type of solicitation in the future, it will include in solicitation materials statements appropriately ascribing to the candidates and to itself the sources of authority and payment as to those solicitations.

ling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* But what, in this case, is the Commission's construction? Do we look to the Commission's litigating position, in which it supports the district court's reading of "direction or control"? Do we rely on the presumably identical reading of the regulation by the three Commissioners who voted in favor of finding probable cause? Or do we defer to the contrary interpretation of the three Commissioners who voted against pursuing the complaint?

In *Democratic Congressional Campaign Committee v. Federal Election Commission*, 831 F.2d 1131 (D.C.Cir.1987) (*DCCC*), we held that when the Commission deadlocks 3–3 and so dismisses a complaint, that dismissal, like any other, is judicially reviewable under § 437g(a)(8). 831 F.2d at 1133. We further held that, to make judicial review a meaningful exercise, the three Commissioners who voted to dismiss must provide a statement of their reasons for so voting. Since those Commissioners constitute a controlling group for purposes of the decision, their rationale necessarily states the agency's reasons for acting as it did. *Id.* at 1134–35. A footnote to the opinion also strongly suggests that, if the meaning of the statute is not clear, a reviewing court should accord deference to the Commission's rationale. *Id.* at 1135 n. 5. This was consistent with the Supreme Court's observation, in upholding (against a complainant's § 437g(a)(8) challenge) the Commission's unanimous dismissal of a complaint, "that the Commission is precisely the type of agency to which deference should presumptively be afforded." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44–45, 70 L.Ed.2d 23 (1981) (*DSCC*). Though our *DCCC* opinion limited itself to its facts, we have since expanded it to control generally situations in which the Commission deadlocks and dismisses. *Common Cause v. Federal Election Comm'n*, 842 F.2d 436, 439 (D.C.Cir.1988); *see also id.* at 451 (R.B. Ginsburg, J., concurring in part and dissenting in part).

The import of *DCCC* today is that we see no material distinction between this case and the Supreme Court's decision in *DSCC*. To be sure, both *DCCC* and *DSCC* were on review of Commission decisions, with supporting rationales, to dismiss complaints. This case differs because we are considering, not an appeal from the § 437g(a)(8) action, but an appeal from the enforcement proceeding commenced as a result of that action. We do not believe the difference matters, however, with respect to which incarnation of the Commission's views is entitled to deference. The district judge's decision in the first phase of this case did not cause the scales to fall from the Commissioners' eyes, did not persuade them, did not in any way cause them to exercise their expertise or policymaking judgment— the twin fonts from which our deference to the Commission flows. Consistent with its earlier vote, the Commission split evenly on the question whether to appeal the district court's first ruling, so no appeal was taken. The three Commissioners who had favored appealing issued a statement explaining that they adhered to their views, and were voting to institute the enforcement action solely because they believed they "were obligated to follow the court's order," and it would be "indefensible for the agency" not to do so. Statement of Reasons of Commissioners Aikens, Elliott & Josefiak, Matter Under Review (MUR) 2282 at 2 (Dec. 10, 1990). The district court itself noted this when it heard the enforcement action, and declined to accord deference to the Commission's "decision" to bring that action. 761 F.Supp. at 816 n. 2. In doing so, the court also correctly recognized that its review of the Commission's "probable cause" decision under § 437g(a)(8) was merely preliminary; authoritative judicial construction of the regulation (whether or not reflecting deference to the Commission's views) had to await actual enforcement—in this proceeding.

█ We thus turn to the question whether Commissioner Josefiak's construction of the regulation, joined by two other Commissioners, can be sustained. Statement of Reasons of Commissioner Josefiak, MUR 2282 (Jan. 30, 1989); Concurrence, MUR

2282 (Feb. 24, 1989). The short answer is yes. The Commission's precedents and statements, both preceding and following the 1986 election, do not clearly establish what "direction or control," for purposes of the regulation, means. In the 1989 rule-making revising this regulation, the Commission was "not able ... to formulate regulatory language that clearly delineates situations where direction or control exists from those in which the conduit does not exercise direction or control." 54 Fed.Reg. 34,098, 34,108 (1989). In light of the First Amendment associational interests implicated by appellants' primary conduct, *see generally Buckley v. Valeo*, 424 U.S. 1, 22, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976), the lack of precision is troubling. It is no less so in light of the fact that NRSC could have applied for an advisory opinion, pursuant to 2 U.S.C. § 437f. The history of this proceeding strongly suggests that such a request would have resulted only in another evenly-divided Commission. This suspicion is borne out by what later occurred: an advisory opinion request to the Commission on this issue produced deadlock. *See* Advisory Opinion 1991–29, Fed. Election Camp. Fin. Guide (CCH) ¶ 6036, at 11,755 (1991); *id.* at 11,757–59 (concurring opinion of Commissioner Josefiak).

Further, as Commissioner Josefiak noted in his statement, under the regulation as written and the Commission's precedents interpreting it, no persuasive reasons have been offered to explain why the factors relied on in this case amount to "direction or control." The statement identified the two main factors the Commission's General Counsel, and later the district court, invoked to support a finding of direction or control, and pointed out the present inadequacy of each.

The first factor was that the contributions were deposited in NRSC's bank accounts before being forwarded to the candidates for whom the contributions were earmarked.[7] However, counsel for the Commission conceded at oral argument that this state of affairs not only is contemplated but expressly permitted by the Commission's regulations. Transcript of Oral Argument at 29–31 (Apr. 23, 1992). The concession was well-founded. *See* 11 C.F.R. § 110.6(c)(1)(i), (c)(4)(iii). Nothing has been offered to reveal why engaging in a Commission-approved practice should cause one to run afoul of the other Commission rules.

The second factor was that NRSC "controlled" the choice of candidates for whom contributions would be solicited, by selecting which candidates were included in the campaign, and further by selecting which four states would be mentioned in each individual letter. (Related to this factor is the idea that NRSC somehow selected the amount of the contribution by providing three boxes to check: two with specific amounts and one with a blank line labelled "other.") The problem is that if this establishes "direction or control" within the meaning of § 110.6(d)(2) then every solicitation qualifies for the same treatment. Every solicitation "pre-selects" candidates to some degree. It is fanciful to suppose that national political committees of any party would expend their resources merely to urge individuals to contribute to the candidate of their choice. Committees of one party gather funds for candidates of that party. The Commission knew this as well as anyone when it promulgated § 110.-6(d)(2).

Commissioner Josefiak's view also accords with Commission precedent on the question. *See* Advisory Opinion 1980–46,

---

**7.** The district court, in the first phase of the proceedings, held in the alternative that the individual donors had not "earmarked" their contributions, which therefore counted against NRSC's limits. 729 F.Supp. at 152. The Commission does not press the point here, perhaps in recognition of the Supreme Court's statement in *Buckley v. Valeo*, 424 U.S. 1, 43–44 n. 51, 96 S.Ct. 612, 646 n. 51, 46 L.Ed.2d 659 (1976), that an "earmarked" contribution—that is, a contri-bution made to a "clearly identified" candidate through an "unambiguous reference" (2 U.S.C. § 431(18)(C))—"would include use of the candidate's ... status as a candidate (*e.g.*, ... the senatorial candidate of the Republican Party of Georgia)." Here each contributor directed that his or her contribution be split equally among the Republican senatorial candidates in four named states.

Fed. Election Camp. Fin. Guide (CCH) ¶ 5508 (1980) (*NCPAC*). In the *NCPAC* opinion, the Commission held that "a mass mailing advocating the election of a clearly identified candidate" and including "a suggestion that a contribution ... be mailed to NCPAC" did not constitute direction or control within the meaning of § 110.6(d). Fed. Election Camp. Fin. Guide (CCH) at 10,589. The Commission's opinion rested mainly on the fact that "the individual contributor, not NCPAC, chooses whether to make a contribution," to which the Commission added that "[t]he fact that a potential contributor may decide against making a contribution indicates lack of control over the choice of the recipient candidate by NCPAC." *Id.* at 10,590. So here, where more than 90 percent of those solicited did not contribute. *See also* Matter Under Review 1028 (Council for a Liveable World) (1980). The one case in recent years where the Commission has found direction or control concerned a "corporate-sponsored political contributions program" in which "personnel from the corporate president's office ... [sought] to convince ... executive and adminsitrative [sic] personnel" to make contributions. Advisory Opinion 1986–4, Fed. Election Camp. Fin. Guide (CCH) ¶ 5846, at 11,246 (1986). The potential for "control" in such a context is apparent.

To find direction or control on these facts would require a substantial shift in the Commission's construction of the language contained in § 110.6(d). To do so on the basis of the two factors discussed above would threaten to vitiate § 110.6(c), which specifies the procedures for handling and reporting earmarked contributions, and would throw into doubt whether any solicitation of *any* earmarked contribution would be exempt from the "double-counting" requirements of § 110.6(d)(2). This case does not require us to decide if that would be a permissible construction of the regulation in light of its terms, the statute, or the Constitution. It is enough to say that the Commission has not affirmatively adopted such a construction and that it has provided, through the statement of Commissioner Josefiak, joined by two others, a reasoned justification for not doing so. It

was error for the district court to force a different construction upon the Commission and the entities subject to its regulation.

The judgment of the district court is *Reversed.*