# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 6, 2016      Decided October 25, 2016

No. 14-1244

PUBLIC CITIZEN, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALPINE CORPORATION, ET AL.,
INTERVENORS

---

Consolidated with 14-1246

---

On Petitions for Review of Notices of
the Federal Energy Regulatory Commission

---

*Scott L. Nelson* argued the cause for petitioner Public Citizen, Inc. With him on the briefs was *Lynn N. Hargis*.

*John S. Wright*, Assistant Attorney General, Office of the Attorney General for the State of Connecticut, argued the cause for State Petitioners. With him on the briefs were *Michael C. Wertheimer*, *Robert L. Marconi*, and *Clare E. Kindall*, Assistant Attorneys General, and *Elin Katz* and *Joseph A. Rosenthal*.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Karin L. Larson*.

*Paul A. Mezzina* argued the cause for intervenors. With him on the brief were *Ashley C. Parrish*, *David G. Tewksbury*, *Abraham H. Silverman*, *Cortney Madea*, *Bruce F. Anderson*, *Paul Franklin Wight*, and *John L. Shepherd Jr.*

Before: BROWN, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by BROWN, *Circuit Judge*.

BROWN, *Circuit Judge*: In this consolidated case, Petitioners Public Citizen and Connecticut seek review of two Notices issued by the Federal Energy Regulatory Commission as part of ISO New England's eighth forward-capacity market. They contend we have jurisdiction because the Notices constitute either orders under the Federal Power Act or action unlawfully withheld under the Administrative Procedure Act. We disagree and dismiss for lack of jurisdiction.

## I.

ISO New England ("ISO-NE") is a private, nonprofit entity that, among other things, administers New England's energy markets. The Federal Energy Regulatory Commission ("FERC" or "the Commission") is an independent agency composed of up to five members appointed by the President. *See* 42 U.S.C. § 7171(a)–(b). Among other responsibilities, FERC has the authority under the Federal Power Act ("the FPA") to regulate rates for wholesale electricity. *See* 16 U.S.C. §§ 824d–824e. A forward-capacity market ("FCM") is a particular type of wholesale market for electricity.

This case concerns whether FERC's response to ISO-NE's 2014 FCM auction ("FCA 8") ran afoul of its FPA obligations. We therefore begin by surveying the relevant FPA provisions and describing the mechanics of an FCM auction.

## A.

FPA Section 205(a) states all rates and charges—including those for wholesale electric energy—"shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U.S.C. § 824d(a).

Sections 205 and 206 provide two mechanisms through which FERC can fulfill its statutory charge of ensuring the justness and reasonableness of rates. Section 205 governs the lawfulness of proposed rates; Section 205(d) requires utilities to file all proposed changes with FERC, and, "unless the Commission otherwise orders," filed rates cannot go into effect without "sixty days' notice to the Commission and to the public." *Id.* § 824d(d). Section 205(e) further authorizes FERC, "either upon complaint or upon its own initiative[,]" to hold hearings on the lawfulness of proposed rates. *Id.* § 824d(e). "[P]ending such hearing," it "may" also suspend the rates for up to "five months beyond the time when [they] would otherwise go into effect." *Id.* Section 206 permits FERC to review—and third parties to challenge—rates that have already become effective. *Id.* § 824e(a).

## B.

In 2006, FERC approved a Settlement Agreement and Tariff permitting ISO-NE to conduct annual FCM auctions. *See Devon Power LLC*, 117 F.E.R.C. ¶ 61,133 (2006). The Settlement Agreement provides for "thorough review of the final auction clearing prices by the Commission" and any

interested parties. *Id.* at P 93. It further states "[P]arties may challenge [proposed rates] under the 'just and reasonable standard' and the Commission will address such challenges under that standard." *Id.*

FCMs differ from other energy markets because "'[c]apacity' is not electricity itself but the ability to produce it when necessary. It amounts to a kind of call option that electricity transmitters purchase from parties—generally, generators—who can either produce more or consume less when required." *Conn. Dep't of Pub. Util. Control v. Fed. Energy Regulatory Comm'n*, 569 F.3d 477, 479 (D.C. Cir. 2009). ISO-NE's FCMs are conducted three years in advance so as to encourage competition and market entry. *See Blumenthal v. Fed. Energy Regulatory Comm'n*, 552 F.3d 875, 879 (D.C. Cir. 2014). Thus, in an FCM, electricity providers do not purchase energy itself, but the option to buy a quantity of energy three years hence. *See id.*

In the annual FCM auctions—which set capacity prices—ISO-NE first determines the net amount of capacity required by the region. *ISO New England, Inc.*, 148 F.E.R.C. ¶ 61,201 at P 2 (2014). Suppliers willing to provide capacity submit bids reflecting the lowest price they will accept before exiting the market for that year. *Id.* In the ensuing "descending clock" auction, the price continues to fall and bidders continue to exit "until the amount of capacity remaining in the auction is equal to the net Installed Capacity Requirement." *Id.* At this point, the auction terminates, and "all resources remaining in the auction receive capacity obligations at the auction clearing price." *Id.* However, "[u]nder some circumstances relating primarily to the sufficiency of competition within the auction, [capacity prices] may be administratively determined by ISO-NE." *Id.* at P 2 n.4.

ISO-NE conducted FCA 8 on February 3, 2014. On February 28, pursuant to its Tariff obligations, it filed the auction results with FERC for review under FPA Section 205. *See Devon Power LLC*, 117 F.E.R.C. ¶ 61,133 at P 78. Due to insufficient competition, the auction defaulted to administrative pricing rules, and it resulted in regional capacity price increases from approximately $1.2 billion to approximately $3 billion over one year.

On April 14, Petitioners filed a timely objection to the rates,[1] arguing they resulted from the unilateral exercise of market power. Subsequently, Petitioners each requested FERC affirmatively determine whether FCA 8's rates were just and reasonable and assess whether the market was unduly manipulated during the auction. In response, on June 27, FERC issued ISO-NE a deficiency letter requesting additional information concerning the auction. ISO-NE provided the information on July 17.

Sixty-one days later, on September 16, 2014, FERC's Secretary issued a Notice acknowledging the FCA 8 rates had become effective by operation of law pursuant to FPA Section 205.[2] Individual statements released by the Commissioners revealed FERC—which at the time was composed of only four Commissioners—had deadlocked about whether to approve the rates or set them for hearing. In a joint statement, two Commissioners concluded the Settlement Agreement required

---

[1] ISO-NE's Tariff states third parties must file objections with FERC within forty-five days of ISO-NE filing the auction results.

[2] FERC also issued an order under FPA Section 206 requiring ISO-NE to make certain prospective revisions to its Tariff. *ISO New England, Inc.*, 148 F.E.R.C. ¶ 61,201 at P 12. It also investigated a specific utility's bidding behavior, ultimately concluding the behavior was justified. *Id.* at P 11.

FERC to examine the reasonableness of the auction rates because evidence suggested FCA 8 had been influenced by the exercise of market power. The other two—one of whom was FERC's current Chairperson—would have approved the rates. According to the Chairperson, as long as ISO-NE had conducted the auction in accordance with a FERC-approved tariff, the Commission lacked authority to assess justness or reasonableness.

Petitioners separately filed for rehearing. The Secretary issued a second Notice explaining the first Notice was not a Commission Order and, consequently, the requests for rehearing "[did] not lie." J.A. 154. Petitioners' cases were consolidated before this Court, where they now ask us to review the Notices as final orders under FPA Section 313(b). Alternatively, they argue the FPA compels FERC to set challenged rates for a hearing and prevents FERC from permitting unjust rates to take effect; the Commission's failure to perform either duty constitutes action unlawfully withheld under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(1). Under either theory of jurisdiction, Petitioners contend FERC's reasons for permitting FCA 8's rates to become effective were arbitrary and capricious. *See id.* § 706(2). They therefore ask this Court to remand with instructions to FERC to assess the justness and reasonableness of FCA 8's rates.

## II.

At the outset, we must fulfill our "independent obligation to assure ourselves that jurisdiction is proper." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008). As we have explained, "[a] federal court's subject-matter jurisdiction . . . extends only so far as [the] Congress provides by statute," *Friends of the Earth v. U.S. EPA*, 333 F.3d 184, 187 (D.C. Cir. 2003), and is "strictly

limited to the agency action(s) included therein." *NetCoalition v. Sec. Exch. Comm'n*, 715 F.3d 342, 348 (D.C. Cir. 2013). Since jurisdiction grants the "power to declare the law," *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868), it is incumbent upon us to determine we are acting within the sphere of our legitimate authority.

**A.**

Petitioners first seek review of the secretarial Notices as orders under FPA Section 313(b), which permits "[a]ny party . . . aggrieved by an order issued by the Commission . . . [to] obtain a review of such order." 16 U.S.C. § 825*l*(b). They advance three arguments as to why Section 313(b) encompasses FERC's actions here, all of which fail.

Petitioners begin by correctly noting that, in various contexts including the FPA, we have previously defined "order" expansively to include "*any agency action* capable of review on the basis of the administrative record." *Inv. Co. Inst. v. Bd. of Governors of the Fed. Reserve Sys.*, 551 F.2d 1270, 1278 (D.C. Cir. 1977) (emphasis added); *Kan. Power & Light Co. v. Fed. Power Comm'n*, 554 F.2d 1178, 1181 n.4 (D.C. Cir. 1977). However, here, Petitioners cannot demonstrate FERC engaged in agency action; they therefore cannot seek recourse under this broad definition.

As a preliminary matter, FERC's enabling statute provides at least three Commissioners must be present to constitute a quorum and "[a]ctions of the Commission shall be determined by a majority vote of the members present." 42 U.S.C. § 7171(e). These requirements comport with the "almost universally accepted common-law rule" that only a "majority of a collective body is empowered to act for the body." *Fed. Trade Comm'n v. Flotill Prods., Inc.*, 389 U.S. 179, 183 (1967). They also accord with this Court's recognition that an

agency's authority runs to it as "an entity apart from its members, and it is its institutional decisions—none other—that bear legal significance." *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974).

Thus, whether analyzed under the statutorily-prescribed requirements for Commission action or under general institutional principles, we reach the same conclusion: FERC did not engage in collective, institutional action when it deadlocked on FCA 8's rates. Consequently, the Notices describing the effects of that deadlock are not reviewable orders under the FPA. *See Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131–32 (D.C. Cir. 2007) (concluding FCC deadlock was not "agency action" and the press release describing the deadlock was "purely informational"); *AT&T Corp. v. FCC*, 369 F.3d 554, 556 (D.C. Cir. 2004) (finding a Notice describing the effects of a statutory sunset provision to be a nonreviewable agency action because it described something that occurred "'by operation of law,' not by Commission action").

The very definition of "deadlock" reinforces our conclusion. *Webster's* defines deadlock as "a state of inaction . . . resulting from the opposition of equally powerful uncompromising . . . factions." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 319 (11th ed. 2009); *see also* 4 OXFORD ENGLISH DICTIONARY 290 (2d ed. 1989) (defining deadlock as "[a] condition or situation in which it is impossible to proceed or act; a complete standstill"). By its very terms, then, the nature of a deadlock confirms FERC neither reached a collective decision nor engaged in an "action" of any kind.

Petitioners nevertheless urge us to apply our treatment of deadlocks under the Federal Election Campaign Act ("FECA"). *See Fed. Election Comm'n v. Nat'l Republican*

*Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992). There, we have held the Federal Election Commission ("FEC") engages in final agency action when, after receiving a complaint alleging certain types of campaign finance violations, it deadlocks about whether probable cause exists to proceed with an investigation. *Id.* "[T]o make judicial review a meaningful exercise," we treat the statements of the Commissioners voting to dismiss the complaint as the administrative record. *Id.*

As does the FPA with FERC, FECA requires FEC to act by majority vote. *See* 52 U.S.C. § 30106(c); *id.* § 30109(a)(2). But, there are other obvious and significant differences between FECA and FPA.

First, FECA's text explicitly permits review of probable-cause deadlocks as agency action. Unlike FPA Section 313(b), FECA allows "[a]ny party aggrieved by an order of the Commission *dismissing a complaint* filed by such party . . . *or by a failure of the Commission to act* on such complaint" to seek judicial review. 52 U.S.C. § 30109(a)(8)(A) (emphases added). Further, FEC cannot investigate complaints absent majority vote, *see id.* § 30109(a)(2), meaning the statute compels FEC to dismiss complaints in deadlock situations. *See also Nat'l Republican Senatorial Comm.*, 966 F.2d at 1476. Therefore, recognizing FECA deadlocks as agency action does not require this Court to broaden its statutorily-defined jurisdiction; the treatment of probable cause deadlocks as agency action is baked into the very text of the statute.[3] *See also Hispanic Leadership Fund, Inc. v. Fed. Election Comm'n*, 897 F. Supp. 2d 407, 428 (E.D. Va. 2012) (finding unreviewable an FEC deadlock about

[3] We recognize Petitioners also believe FPA compels FERC to act. As described *infra* Part II.B., we find that argument similarly unavailing.

whether advertisements constituted prohibited election communications because, unlike deadlocks leading to the dismissal of private complaints, it resulted "only in the FEC concluding that it was unable to reach a determination").

Second and more generally, Congress uniquely structured the FEC toward maintaining the status quo, increasing the appropriateness of recognizing deadlocks as agency action in that specific context. As an initial matter, FEC always includes six Commissioners, distinguishing it from the vast majority of agencies with an odd number of members. No more than three FEC Commissioners may be affiliated with the same political party. 52 U.S.C. § 30106(a)(1). The voting and membership requirements mean that, unlike other agencies—where deadlocks are rather atypical—FEC will regularly deadlock as part of its *modus operandi*. Taken together, FEC's structural design and FECA's legal requirement to dismiss complaints in deadlock situations mark FECA as an exception to the rule. Absent a similar congressional indication in the FPA or FERC's enabling statute, the FEC approach should not be imported here.

Finally, Petitioners seek to expand our FPA jurisdiction by invoking the "strong presumption that Congress intends judicial review of administrative action." *Amador Cty. v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011). It bears emphasizing, however, that this presumption applies *only* to "final agency action." *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); 16 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3942. As just described, FERC did not engage in agency action at all, let alone final agency action.

Final agency action is that which "mark[s] the consummation of the agency's decisionmaking process."

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Further, it must determine rights and obligations or result in legal consequences. *Id.* at 178; *see also Papago Tribal Util. Auth. v. Fed. Energy Regulatory Comm'n*, 628 F.2d 235, 239 (D.C. Cir. 1980) (noting courts may review an interlocutory order issued by FERC if it is "definitive" and "imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process"). Here, the presumption does not attach because the deadlock does not reflect an agency decision that fully resolved the issue or completed the process. *See Consummate*, BLACK'S LAW DICTIONARY (10th ed. 2014). In fact, it did quite the opposite, leaving FERC mired in indecision and impasse. Thus, the deadlock lacks the requisite finality for the presumption to apply.[4]

---

[4] Petitioners rely on the "practical" considerations that have previously guided our reviewability determinations, *see Papago*, 628 F.2d at 239, but these considerations do not alter our conclusion. As relevant here, Petitioners note that, under FPA Section 205, FERC carries the burden of demonstrating the reasonableness of rates, *see* 16 U.S.C. § 824d(e); that burden shifts to challengers under Section 206. *See id.* § 824e(b). Further, per the Settlement Agreement's terms, Section 206 challenges are governed by the *Mobile-Sierra* "public interest" test, which Petitioners contend constitutes a more stringent legal standard. *See Potomac Elec. Power Co. v. Fed. Energy Regulatory Comm'n*, 210 F.3d 403, 407–09 (D.C. Cir. 2000). Petitioners argue these differences will work irreparable injury to them should this Court deny review here. We disagree. Section 206 proceedings may in some ways be less amenable to Petitioners, yet the fact remains an avenue of review is available to them. FERC has represented that nothing in its prior orders precludes Petitioners from pursuing relief under Section 206. Additionally, practical and prudential considerations, however compelling, cannot provide the basis for our jurisdiction absent demonstrated final agency action and clear congressional authority.

In sum, we hold FERC's deadlock does not constitute agency action,[5] and the Notices describing the effects of the deadlock are not reviewable orders under the FPA.[6]

---

*See NetCoalition*, 715 F.3d at 348; *see also S. Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444 (1979) (finding an order issued by the Interstate Commerce Commission unreviewable even though doing so meant challengers had to proceed under a statutory section that offered different remedies and shifted the burden of proof to challengers).

[5] The lack of collective action attributable to the entire Commission distinguishes this case from our decisions in *Cajun Electric Power Cooperative, Inc. v. Federal Energy Regulatory Commission*, 28 F.3d 173 (D.C. Cir. 1994), and *City of Batavia v. Federal Energy Regulatory Commission*, 672 F.2d 64 (D.C. Cir. 1982). In *Cajun Electric*, FERC *issued an order* approving proposed tariffs as reasonable after receiving timely challenges to filed tariffs. 28 F.3d at 175–76. In *Batavia*, FERC as a body issued *an order* adopting a "mistaken belief . . . about its investigative authority." 672 F.2d at 75, 77.

[6] Petitioner Connecticut stresses the importance of reading the FPA "in context" with the Settlement Agreement's review provision. Pet'r Jepsen Br. 23–24; *see Devon Power LLC*, 117 F.E.R.C. ¶ 61,133 at P 93. Specifically, Connecticut suggests reading "order" in Section 313(b) too literally would "be in violation of" the Settlement Agreement. Pet'r Jepsen Br. at 23. Petitioner is incorrect. Determining our subject-matter jurisdiction is not a contextual inquiry, capable of case-by-case expansion or contraction. Rather, it involves a factual inquiry into the objective limits of our Congressionally-defined power to act. Our determination, properly grounded, is incapable of "violating" anything.

**B.**

We next consider whether the APA confers jurisdiction over Petitioners' claims.

The APA permits judicial review of agency action, including the failure to act. *See* 5 U.S.C. §§ 551(13), 702. Inaction is reviewable only where the agency fails to take a "discrete" action it is legally required to take. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004). Action is "legally required" if the statute provides a "specific, unequivocal command" to an agency or "a precise, definite act . . . about which [an official has] no discretion whatever." *Id.* at 63 (discussing the connection between the reviewability of inaction and the writ of mandamus). Accordingly, this Court has imposed "strict limits" on reviewable inactions. *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).

Thus, here, we ask whether the FPA compelled FERC either to set the disputed rates for hearing or to affirmatively prevent any unjust and unreasonable rates from going into effect. The parties disagree about which case controls this question.

Petitioners proffer *Amador County v. Salazar*, 640 F.3d 379 (D.C. Cir. 2011), where this Court assessed the Secretary of the Interior's responsibilities under the Indian Gaming Regulatory Act ("IGRA"). IGRA authorizes no-action approvals of proposed gaming compacts which, after 45 days, "shall be considered to have been approved by the Secretary, *but only to the extent the compact is consistent with the [Act's] provisions*." 25 U.S.C. § 2710(d)(8)(C) (emphasis added). This Court found the latter clause demonstrated "Congress [had] limited the extent to which a compact could be approved by operation of law," thus obligating the Secretary to

"affirmatively disapprove" any compacts violating the limit. *Id.* at 382. Petitioners contend FPA Section 205(a)'s pronouncement that "any such rate or charge that is not just and reasonable is hereby declared to be unlawful" imposes an analogous duty upon FERC to disapprove any unjust or unreasonable rate. 16 U.S.C. § 824d(a).

By contrast, FERC analogizes these facts to *Sprint Nextel Corp. v. FCC*. There, this Court assessed the reviewability of an FCC deadlock under a provision of the Communications Act stating a forbearance petition "shall be deemed granted" if the FCC does not deny it within a statutorily-prescribed period. *Sprint Nextel*, 508 F.3d at 1131–32. We noted that, because the FCC acts by majority vote, "[t]ies . . . do not result in Commission action." *Id.* at 1132. Instead, the petition was granted "by operation of law." *Id.* As such, the deadlock was unreviewable, since "[t]he Commission did not engage in any circumscribed, discrete" act; rather, "Congress, not the Commission, 'granted' [the] forbearance petition." *Id.* at 1131–32.

We conclude *Sprint Nextel* controls. Section 205(a)'s statement concerning the unlawfulness of unjust and unreasonable rates does not rise to an inexorable command like that found in IGRA. *See also Meina Xie v. Kerry*, 780 F.3d 405, 406, 408 (D.C. Cir. 2015) (holding a statutory provision stating "immigrant visas . . . shall be issued . . . in the order in which a petition . . . is filed with the Attorney General" had "establish[ed] a specific principle of temporal priority that clearly reins in the agency's discretion"). It does not compel FERC to engage in nondiscretionary activity either by commanding FERC to set disputed rates for a hearing or by mandating FERC disapprove any unjust or unreasonable rates. Instead, it functions as a stand-alone, declarative statement, reiterating the FPA's overall goal of proscribing unjust and

unreasonable rates. Thus, we conclude the FPA does not mandatorily obligate FERC to engage in either of Petitioners' desired actions.

Our conclusion is buttressed by the Supreme Court's interpretation of the Interstate Commerce Commission's ("ICC") duties under the Interstate Commerce Act ("ICA"). In *Southern Railway Co. v. Allied Seaboard Milling Corp.*, the Court held the ICC's decision not to investigate challenges levied against proposed seasonal rate increases unreviewable. 442 U.S. 444, 446, 448 (1979). *Southern Railway* concerned a direct review statute rather than the APA; however, the marked structural and linguistic similarities between the FPA and ICA nevertheless render the Court's reasoning and conclusions instructive. *See Papago*, 628 F.2d at 243 (indicating *Southern Railway*'s germaneness to FERC and the FPA).

At the time the Court decided *Southern Railway*, the ICA contained three notable similarities to the FPA. First, like FPA Section 205(a), the ICA stated "[a]ll charges made for any service rendered or to be rendered in the transportation of passengers or property . . . shall be reasonable and just; and every unjust and unreasonable charge for such service is . . . declared to be unlawful." 24 Stat. 379. Second, ICA Section 15(8)(a) mirrored FPA Section 205(e) by providing that, upon receipt of a proposed rate schedule, "the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate." 90 Stat. 31. Third, in another provision analogous to FPA Section 205(e), ICA Section 15(8)(b) authorized the Commission to suspend a proposed schedule for seven months "[p]ending a hearing." *Id.*

After receiving the complaint at issue in *Southern Railway*, the ICC engaged in some corrective action with the railroads, but also issued an order declining to either set the rates for a hearing or temporarily suspend the rates. 442 U.S. at 449–50. In holding the no-investigation decision unreviewable, the Court pointed to the statute's use of "permissive" language in Section 15(8)(a), as well as its lack of "standards to guide both the Commission in exercising its authority and the courts in reviewing that exercise." *Id.* at 456. Though not squarely addressed, the ICC's declaration of the unlawfulness of unjust and unreasonable rates did not alter the Court's conclusion that the ICA afforded the Commission unreviewable discretion over investigation decisions.

Section 205(e)'s language grants FERC similar discretion, stating it "shall have authority" to hold hearings and that it "may" suspend rates. 16 U.S.C. 824d(e). Likewise, it contains no standards cabining FERC's discretion or enabling this Court to meaningfully review how the Commission exercises its discretion. Taken together, *Sprint Nextel* and *Southern Railway* lead us to hold the FPA did not compel FERC to either set the disputed rates for hearing or affirmatively disapprove any unjust or unreasonable rates through the Section 205 process. Since the action was not legally required, we have no jurisdiction under the APA.[7]

---

[7] Our recent decision in *Xcel Energy Services v. Federal Energy Regulatory Commission*, 815 F.3d 947 (D.C. Cir. 2016), does not undermine our holding. There, FERC entered an order accepting a Tariff revision notwithstanding its conclusion that the proposed rates "may not be just and reasonable." *Id.* at 950–51. FERC later "acknowledged that it erred as a matter of law in allowing [the] proposed rates to take effect . . . despite the acknowledged need for further section 205 review." *Id.* at 953. We held "where the Commission acknowledges that it acted contrary to section 205[,] . . .

**III.**

We conclude by repeating what we initially recognized in *Sprint Nextel*: "because a deadlocked vote is unreviewable, we lack jurisdiction in what may be the hardest cases." 508 F.3d at 1133. And so it is with Petitioners. FERC approved a Settlement Agreement providing, "[P]arties may challenge [proposed rates] under the 'just and reasonable standard' and the Commission will address such challenges under that standard." *Devon Power LLC*, 117 F.E.R.C. ¶ 61,133 at P 93. Not only did the deadlock prevent FERC from accomplishing this review, but the Commission Chairperson disclaimed authority to engage in any review whatsoever, so long as ISO-NE conducted the auction in accordance with its tariff. This interpretation seems questionable at best. And yet, without jurisdiction, we simply lack the power to assess its validity. Any unfairness associated with this outcome inheres in the very text of the FPA. Accordingly, it lies with Congress, not this Court, to provide the remedy.

Since neither the FPA nor the APA grants us the power to hear these claims, we are compelled to "dismiss[] the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) at 514.

*So ordered.*

---

its initial rate order is *ultra vires*." *Id.* at 956. *Xcel* is distinguishable on two relevant grounds. First, it involved an undisputedly final agency action reached by majority vote. Second, it addressed a fundamentally different question from that presented in this case. Whereas we consider FERC's Section 205 obligations as an initial matter, *Xcel* addresses FERC's statutory duties once it has affirmatively determined the proposed rates may be unlawful. Since FERC never reached a similar conclusion here, *Xcel* does not govern.